Case number 19-5132, Danyel Martin v. Warren County, Kentucky, et al. Oral argument not to exceed 15 minutes per side. Gregory Belsley for the appellant, you may proceed. Good morning, your honors. May it please the court, counsel for the defendants, if your honors please, I've reserved three minutes for rebuttal. My name is Greg Belsley. I'm here this morning on behalf of Danyel Martin, the mother of Eddie Burke who died in the Warren County jail while he was incarcerated there awaiting trial and was a pretrial detainee. When Mr. Burke entered the jail, he identified two co-complicating medical conditions, one diabetes, insulin-dependent diabetes, the other Addison's disease, each of which complicated the other, each of which could cause the death unless he received adequate medical care. He ended up dying in the jail and his death was preventable. It was caused as the consequence of repeated violations by the medical staff responsible for him, not only of the standard of care, but their employer's own written policies, procedures, and protocols that were intended to prevent Mr. Burke's death. We argue below that this constituted both deliberate indifference, if not deliberate indifference, then at least objective unreasonableness, citing the Supreme Court's decision in the Kingsley case. If the court believes or agrees with the court below that this does not constitute deliberate indifference, we appear this morning to urge the court to follow the path set by the Supreme Court in Kingsley, which has been taken up by the Second Circuit, the Seventh Circuit, and the Ninth Circuit, and apply. If we didn't follow Kingsley, would you lose? I don't believe so, Your Honor. I think we have deliberate indifference in this case, and here is why. We have a situation when it comes down to Mr. Burke's actual death. The day before he dies, he was receiving prednisone for his Addison's disease. We have an expert that has testified that when you get that prednisone, your body becomes dependent upon it, and your body stops producing its own cortisol. A sudden, immediate interruption of that can trigger the adrenal crisis that we believe killed Mr. Burke. He was offered his prednisone that morning. He refused his prednisone because he was afraid it would make his sugar go too low. Now, even though in that sort of a situation, the policies required that a physician be contacted and told that this young man, he was 21 years old, was refusing a medication under circumstances that could put him at risk of death, nobody was called. So is it key that refusing this medication could cause his death, or should the, it was a medical technician, right, Crane, who refused, who didn't do anything after he refused the medicine. So what if he simply refused a standard medicine, like a dose of an antibiotic or something? Well, in that sort of a case, I still believe that the policies, that SHP has a refusal of medication form that requires that the physician be notified. And their CEO has testified that the reason for that is because they don't want nurses deciding whether or not it's okay for somebody to refuse medication. So a doctor has to be notified according to their policy? It says the physician. Because my understanding is that the physician here didn't come to the jail except like once every few months. That's right. That's another problem that we have with this case, Your Honor, and that is that we have a history here. We're dealing here with a business model, Your Honor, where even though the physician was supposed to be there at least once a week under his contract with SHP, he never came to the jail. He would be there once every quarter, once every four months if that. SHP knew that. They said it was okay. And instead, what the physician was doing was he was sending an APRN to the jail. And this was a jail with 500 inmates, sending an APRN to the jail once a week to see patients that LPNs, who can neither diagnose nor treat illness, believed the APRN needed to see. But how does any of that connect to your claim right now? So your claim is that Crane didn't call the doctor even though the policies required that. I mean, even if he had followed the policies, which was to have the doctor present once a week, if it wasn't on that one day, it wasn't going to work. I mean, are you saying that the policies should have been such that the doctor was on staff 24-7 or on the grounds? I'm trying to connect what you're saying about these broad policies to the particular injury here. Yes, Your Honor. We're not arguing that he should have been there then, and we're not arguing for a 24-7 policy. What we're arguing is that the nurse should have called the doctor. Okay. And what happens in this sort of format is that there is business as usual. And business as usual sort of devolves to a situation like Judge Moore raised, where an inmate refuses his Tylenol or his antibiotic. Well, you know, business as usual, you don't bother the doctor over that. The problem was Mr. Burke was not business as usual. And to receive adequate medical care, the system has to adjust to Mr. Burke. Under this system, Your Honor, time and time again, and the court can even look back at Judge Stranch's opinion in the Shadrick v. Southern Health Partners case, time and time again, with this company, it's the inmate that has to adjust to their system. And that's what Mr. Burke was trying to do when he refused his prednisone. He's a 21-year-old drug addict with diabetes and Addison's disease, and he's afraid that his blood sugar is going to crash too low if he takes his prednisone, which had happened to him three or four times previously during his incarceration because they never got his blood sugar under control. So you've got essentially a 21-year-old drug addict who is monitoring and managing to the best of his ability his own medical care because the system won't do it for him. They have their system, and their system says, gee, we don't bother people when somebody may be refusing their antibiotic or something like that. So he's refusing his prednisone. We just don't make the call. That's their habit, and the system just fails to adjust. But do you need to show then that this medical technician knew or should have known of the danger of Mr. Burke not taking his prednisone? No. No, Your Honor. And we don't suggest that she should have been trained to make that decision. What she was supposed to do was call the doctor. Well, let's assume that she had a duty to call the doctor, a constitutional duty. That duty can't arise under the Eighth Amendment from a jail policy. So what evidence do you rely upon that that was the cause of his death, the delay, the failure to call the doctor or the delay in receiving treatment? Well, it wasn't the failure to call the doctor. Well, the fact that he didn't get his prednisone was what caused the death. And our expert has said, look, when you've got a sick... We know why he didn't get his prednisone. He refused it. He refused it. Again, how do you go from there to liability? What evidence do you rely upon that somebody had a constitutional duty to do something that then caused his death? Our expert's testimony, Your Honor, our APRN, says if you have a situation like that where a nurse or a med tech is offering an inmate their medication and they refuse it, you need somebody to explain to them what the consequences may be. If after you do that and you actually have an informed refusal that could imperil the life of the inmate, then they need to be put in a situation where they can be carefully monitored so that the medical people can respond in case there's a crisis. That didn't happen here. Why is this more than mere negligence on the part of the jail people? Because, Your Honor, we have here a failure, not only a failure to meet the standard of care, and an intentional failure. We have the failure to follow written policies, procedures, and protocols. When Justice Marshall in Estelle v. Gamble was first articulating the deliberate indifference test and was distinguishing that from negligence, the negligence he was talking about, Your Honor, he called an accident, an innocent misadventure, or an inadvertent failure to provide adequate medical care. You do not have inadvertence when you fail to meet the standard of care, and you certainly don't have it when you have written policies and procedures that tell you what you need to do and which is particularly critical in this system where these inmates are basically taken care of by nobody other than LPNs and RNs. There's nobody in the jail that can ever diagnose or treat their illness. So the company has written policies, if A, then B, and if you disregard that, and they are disregarded, Your Honor, with this company again and again and again, that is more than negligence. It just simply is, and it's costing people's lives. If we were to apply Kingsley here, how would you formulate the test? Because Kingsley was an excessive force case, and this is obviously a medical treatment case. Yes, Your Honor. I would recommend the court look at the Ninth Circuit's decision in Gordon. Don't characterize this test as objective deliberate indifference or requiring recklessness, and I'll get into that in a minute. But what's important about the Ninth Circuit's decision in Gordon is they give the elements, and those elements are simply, one, a defendant, as here, made an intentional decision. There was no inadvertence. Two, such decision put the plaintiff at a risk of serious harm. Three, the defendant failed to take reasonable steps to abate the risk, and four, such failure caused the injury. But at the same time, I urge the court, the amicus brief that was filed with the court, urge the court to adopt an objective deliberate indifference test. The Second Circuit is talking about recklessness as an element. I urge the court to avoid the use of those terms for the very reason the Supreme Court in Kingsley discouraged the use of recklessness in the court's instructions. It suggests a subjective intent that they're trying to avoid with an objective unreasonableness test. Thank you, Your Honors. Good morning, Your Honors. My name is Jane Brannon, and I represent the Southern Health Partner Defendants in this case, and that would be Southern Health Partners, Dr. Ronald Waldridge, Barry Doherty, Talena Lasley, Lynn Gray, and Tasha Crane. Sorry, Mr. Belsley. May it please the court opposing counsel. Mr. Belsley spent a lot of time focusing on the management of Mr. Burke's diabetes and also on the standard to be applied as far as whether it should be objective unreasonableness. I would submit to the court that you all have already keyed in on what I think a big problem, the big problem for the plaintiffs is, which is you have to demonstrate that each individual defendant was individually involved in the deprivation of an inmate's rights and that that deprivation is what resulted in the injury, in this case, Mr. Burke's death. This court does not even have to reach the issue of objective unreasonableness or subjective intent because there is quite simply nothing in the record that supports the causation of Mr. Burke's death. I will address the standards, but I want to focus on the causation issue because I think that helps resolve everything. Let me interrupt you for just a second. Yes, sir. I'm not sure that you've even accurately paraphrased what your opposing counsel's argument is. I think you've accurately described what it was before the lower court that was basically focusing in on the management of his diabetes. Today, unless I just missed it, I thought his argument now is almost solely focused on what they failed to do after he refused his dosage the day before his death. I guess I was referring, Your Honor, to this discussion about a failure to manage his diabetes properly and relying upon the inmate to self-regulate his own condition that Mr. Belsley was arguing kind of at the end. But I think that's absolutely correct that what we need to focus on is this skipped dose of prednisone on the 30th of January. If the argument has sort of morphed into now it's the skipped dose and reliance upon a medical technician's testimony that they should have done other things at the time that he refused that dose, I just want to ask you the same question I asked him, and that is what evidence is there in the record of causation? Your Honor, there is no evidence in the record of any causation of the actions or inactions of the medical technician with respect to the causation of Mr. Burke's death. What is the cause of his death in light of what the evidence is here? The plaintiff's expert, Dr. Falsgraf, testified that the sole cause of Mr. Burke's death was the fact that he skipped the dose of prednisone on January 30th and that once he skipped that dose, the die was cast and his course was set, that there was not a way to avert it after a period of time. Is there any other evidence of causation in the record? The only other evidence of causation is the defense expert, who does not agree with Dr. Falsgraf with respect to the prednisone being the cause. He has opined that it was a sudden coronary arterial spasm that caused his cardiac arrest that was unrelated to the prednisone and was unrelated to any other condition that Mr. Burke had. The coronary arterial spasm would be something that the ship's defendants wouldn't have any control over. It would be a sudden thing that would happen. This is summary judgment, right? That's correct. We're looking at the evidence in the light most favorable to your opponent and the most favorable evidence is that the missing prednisone dose caused his death. Is that right? That is correct. What does the evidence then show as to what your client should have done once he refused? What your fellow counsel has argued is they should have counseled him and they should have told him what the consequences would be, which of course suggests there's something in the record that he didn't know what the consequences were. That's correct. That's not an accurate reflection of what the evidence was, Your Honor. Mr. Burke had, as a child, I think he was 9 or 10, been diagnosed with these conditions, had a long history of being hospitalized and in facilities where he was managed. The testimony from his mother was that he was aware that the sudden cessation of taking the prednisone could result in sudden death and all sorts of other horrific complications. Mr. Burke had been noncompliant with his medication over the years. I mean, he was essentially homeless, so a lot of times it could be... My understanding is that he was not receiving prednisone at the jail for the first few months that he was in the jail. Is that correct? That is correct. So why was that? That was simply an oversight when he was booked in. He made them aware that he had Addison's and he was, at that time, at the time he came in, he was not on any medication for it. Generally speaking, what happens is the nurses follow up on people's medications. He should have been flagged. But the testimony from the plaintiff's expert was that didn't cause this issue with the prednisone. Once he started it, it was fine. He was able to function. It was doing what it was supposed to do. He just couldn't stop it, as he did.  and what the medical tech should have done. Mr. Belsley is accurate in that he says that there is a policy of advising the physician. In this case, the physician's locum, I guess, would be the APRN. Mr. Daugherty advises the physician or the APRN. There's no time frame in the protocol as how soon one has to be contacted. It wouldn't make any sense to notify them three months later of something. That's correct, Your Honor. What happens is there is one day that the physician or the physician's assistant comes, Tuesday, Thursday, whenever. All of the refusals of medications are presented to that doctor at that time who goes through it, or the APRN, who goes through it and says, yes, no, maybe. Couldn't such a policy be a fundamental violation of the responsibilities of a jail to offer appropriate medical care to the prisoners? If somebody refuses a drug that is essential to their lively living, how could saying, well, our policy is once a week the APRN will come to the jail and will review your refusal to take this? That is a fair point. I don't think it rises to the level of a constitutional violation. I don't know that we need to consider that in this case, given that Mr. Burke voluntarily and with knowledge released everyone based on his refusal of the medication. Furthermore, there is absolutely no proof in the record that had Mr. Burke been told this could cause a problem, that he would have, in fact, decided to take the prednisone. Because, in point of fact, he was absolutely right. Prednisone can exacerbate your blood sugar and can cause fluctuations in it. He was not an unsophisticated individual with respect to the management of his disease. And it is not as if anyone was just being left to their own devices. Diabetics frequently are able to gauge better than medical professionals what's going on with them with respect to managing their blood sugar. And so deferring to this patient is not ignoring it. But you didn't defer. Your group, and obviously you're the lawyer, but the group of people didn't defer to this patient vis-a-vis his statement the very same day about his blood sugar being a whack and needing to deal with that. And as I understand it, the LPN said, no, we're not going to do that. So the LPN at the jail was, in fact, rejecting Burke's self-help issues vis-a-vis his diabetes situation that very day, right? Well, Mr. Burke is not allowed, they are not deferring to him when he is requesting something above and beyond what is prescribed, Your Honor. So what happens is blood checks are done at meals and bedtime. After meals, your blood sugar can go up. That's what had happened with Mr. Burke. But he's given insulin at those times. Sometimes he would defer and say, I don't want a full dose, I want a half dose. That's fine. You can decide to take a half of your blood pressure medicine in the morning if you want to. What you can't do is just walk into the pharmacy and say, my blood pressure is too high, give me more pills than has been prescribed. So Mr. Burke was actually requesting additional insulin outside of the prescription that was there. So it wasn't the nurse making a decision about, I'm denying you something that you have been prescribed. And furthermore, that testimony was the testimony of a deputy. Ms. Gray's testimony was that the intention was to go back and test him again within an hour or so to see if his blood sugar had come down and then make some sort of determination, call the doctor, whatever, to see if additional medication was in order. In any event, regardless of that decision, his own expert testified that that didn't cause his cardiac arrest or his death. There's nothing in any of these policies that caused the skipped dose or the missed dose. None of the defendants put up a barrier to him receiving his medication. So Mr. Burke's decision, voluntary decision, I think in addition to the fact that there is no independent causation, supports the grant of summary judgment in the favor of all my clients. I'm seeing that my time is running out. I wanted to kind of address briefly the subjective intent unless the court... Right. I was going to ask you what about your view on the Kingsley test and would it make a difference in this case and so forth. With respect to the Kingsley test, there's nothing in that decision that suggests that it should go beyond excessive force. As we pointed out in our brief, excessive force cases are different from medical treatment cases in that they inherently involve an intentional act. There's no question about the subjective intent to use force. It's a question of degree and reasonableness. So it's not, it doesn't transfer well to an inadequate medical treatment case. Furthermore, with respect to the Castro, Bruno and Gordon cases, although the courts do say that they are taking objective unreasonableness, none of them have gone as far as Mr. Belsley would, which is just a simple violation of the standard of care. That's constitutionalization of a medical malpractice case. I mean, that's all it is. Gordon, Bruno and Castro all still have this component where behavior that is akin to recklessness, failing to act, disregarding in a reckless way, which is what, if you look at the Winkler case that this court handed down in 2018, is what our subjective intent does. As a practical matter, I don't know how the formulation of objective unreasonableness in those three cases differs, because already this court accepts the fact that it doesn't have to be a subjective intent and I did it, I'd do it again if I had half a chance. Recklessness can suffice to satisfy what the Sixth Circuit applies with regard to the subjective intent. I think all that objective unreasonableness can do, the way that it is formulated in those cases, is cause confusion and lead to people thinking that a simple violation of the standard of care arises to the extent of a constitutional violation. And I know that there are issues with respect to pretrial detainees' rights being under the 14th as opposed to the 8th Amendment, but under the Daniels case that we cite from the Supreme Court, the due process rights have to do with a deliberate decision to deprive someone of their life or liberty designed to prevent affirmative abuses of power. Once again, that is connote and denote some form of intent. Your opponent is focused on the policy of not communicating a prisoner's refusal to take medicine, except, as you suggest, once a week to the reviewing APRN person. Could that not be a reckless, satisfy the recklessness test, whether you're calling it under Winkler or under Kingsley, to have a policy that does not communicate beyond a technical person who's just taking this refusal to accept medication? With regard to how it actually works, it's not simply when the APRN or the doctor comes on the day. All of those refusals are reviewed. If there is, as Mr. Balesley says, some sort of significant concern, then it is triaged and they are available on call all the time. With regard to whether that policy is reckless or not, it seems to me that that's something that would require expert proof about what a reasonable company policy ought to be and whether this complies with the industry standards, I suppose. Although, quite frankly, simply violating a policy without more, I'm blanking on the case, but simply failing to comply with a policy without more is not sufficient to demonstrate that you have been reckless or have committed a constitutional violation. I don't know if that addresses the court's concerns or not. It's the best I can do. Well, I'm running very low on time. I just would sum up by saying, once again, you cannot connect the skipped dose and the death of Mr. Burke to any individual's deprivation of this individual's rights. You can't connect it to what caused his death. Even absent his knowing refusal, you could take that concern away, whether or not signing this refusal was sufficient. It's still not sufficient to connect them. Thank you. Thank you very much. Your Honors, the evidence in the case indicates Mr. Burke refused his prednisone because he was afraid it was going to make his sugar go too low. There's absolutely no evidence that he knew it could kill him. There's absolutely no evidence that anybody told him it could. In fact, the next day when he was seen to be so visibly and obviously ill by the guards that they summoned medical care for him, which never came because the LPN refused to go see him, he was asking for insulin. This was not a young man who made a determined decision to kill himself by skipping his prednisone. Now, Kingsley does not say anything that limits it to excessive force. To the contrary, Kingsley, when it comes to the Supreme Court's rationale for moving to an objective unreasonableness test of pre-trial detainees, it's all about the pre-trial detainee, not the nature of the harm. They're talking about the fact that a pre-trial detainee is entitled to a presumption of innocence. Nobody's decided that they should be punished for anything. And so necessarily whether their punishment is sufficiently wanton to constitute a constitutional deprivation never enters the picture. And that's what every case that's considered it, we've cited them here, Miranda, Gordon, every case that has considered and analyzed the philosophy and the language of the court's decision has come to the same conclusion. Importantly, when the Supreme Court ruled in Farmer v. Brennan about the subjective intent test, they distinguished that from excessive force. And they said that excessive force, in fact, in a prison or an incarceration context had a higher burden, that it had to be malicious, sadistic, because police officers or correctional officers are making split-second decisions in difficult circumstances. The Supreme Court in Farmer v. Brennan considered deliberate indifference to be a lower standard that should be applied to things such as medical treatment where there is time for consideration and contemplation of one's acts and the likely consequences. And so with that in mind, if the Supreme Court thinks excessive force in a incarcerative context should be subjected to an objective unreasonableness test, I think that embraces and takes into account the lesser test of deliberate indifference that they applied to transgressions other than excessive force in Farmer v. Brennan. I would only say, Your Honors, that a system that forces a 21-year-old drug addict to self-treat himself and then turns around and blames him for not getting it right needs to be changed, and the law exists for that purpose. And were this circuit to adopt the objective unreasonableness test and join the Second Circuit, the Seventh Circuit and the Ninth Circuit, it will save lives. Thank you. Thank you. Thank you both for your argument. The case will be submitted. And would the clerk call the next case, please.